In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-2553

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN P. SEIWERT,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-443 — **Robert W. Gettleman**, *Judge.*

———————————

ARGUED SEPTEMBER 12, 2024 — DECIDED SEPTEMBER 12, 2025

———————————

Before HAMILTON, SCUDDER, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* By his own admission, John Seiwert has suffered from addiction to heroin and crack cocaine for the past twenty years. A jury convicted Seiwert on two counts of 18 U.S.C. § 922(g)(3), which prohibits users of unlawful drugs and those addicted to such drugs from possessing a firearm. On the day he was found with firearms, Seiwert told officers he had used crack cocaine just a couple of hours earlier and

that he had used crack cocaine and heroin every day for twenty years.

Seiwert contends that § 922(g)(3) violates the Second Amendment and is unconstitutionally vague. He also claims there is insufficient evidence to support his conviction. Applying the framework the Supreme Court announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022), we conclude that § 922(g)(3) does not violate the strictures of the Second Amendment as applied to Seiwert. Moreover, our prior decision in *United States v. Cook*, 970 F.3d 866 (7th Cir. 2020), forecloses his void-for-vagueness challenge. Lastly, the evidence at trial overwhelmingly supports Seiwert's guilt. Thus, we affirm.

**I**

In June 2020, Seiwert had been living at home with his father in Orland Park, Illinois. His father, a gun collector, passed away on June 27. Two days later, Seiwert invited his drug dealer Dennis German to his house. Law enforcement had been investigating German in connection with a drug trafficking operation based in Robbins, Illinois. While surveilling German's residence from February through June 2020, officers observed Seiwert visiting German "very frequently, sometimes daily, sometimes multiple times per day."

During German's visit to Seiwert's home, Seiwert gave German a Beretta pistol, expecting narcotics in return. Later that evening, law enforcement observed German firing a gun outside his house. The next day, on June 30, law enforcement searched German's residence and recovered the Beretta that Seiwert had given him along with bags of suspected narcotics. Officers also searched German's phone and found many

messages from Seiwert, including coded messages requesting drugs. Among them was a message Seiwert sent earlier that day offering German a Ruger revolver and depicting the firearm resting on Seiwert's leg.

On July 30, law enforcement executed a warrant to search Seiwert's home and recovered a Ruger revolver and approximately a hundred other firearms. Officers also discovered two digital scales, a wooden pipe, a glass pipe, a needle, an herb grinder, and a triple beam balance scale.

Following the search, Seiwert and a friend who was also present at the home agreed to go to the police station for further questioning. In the police vehicle, Seiwert made multiple references to his drug possession and use, all of which were recorded. For example, he told his friend that he could not remember where he "put the dope [in his house] at"; he hoped that law enforcement would "pass it by" during the search; he had put his "damn pipe in the fucking stove"; and he "took the crack out of [his] pants" and "hid it under the couch" before they left. Seiwert also told agents that he was "a user, not a drug dealer," and requested that if officers found anything in his home "drug wise," that they "leave it there."

At the station, after receiving *Miranda* warnings, Seiwert admitted to using crack cocaine a "[c]ouple hours" earlier that day. He also stated that he had used heroin and crack cocaine every day for twenty years and that he was a "functioning drug addict." What is more, Seiwert estimated that he had purchased drugs from German over 300 times since November of the previous year. And when asked about the cash found on his person, Seiwert explained that he had intended to use $60 of the cash to purchase drugs from a dealer.

A grand jury charged Seiwert with two counts of possessing a firearm while knowing that he was an unlawful user of, and addicted to, a controlled substance in violation of 18 U.S.C. § 922(g)(3). Count One alleged that Seiwert possessed a Beretta pistol on or about June 27, 2020, until June 29, 2020. Count Two alleged that Seiwert possessed a Ruger revolver on or about June 27, 2020, until July 30, 2020.

Before trial, Seiwert moved twice to dismiss the indictment. In the first motion, he argued that § 922(g)(3) was unconstitutionally vague on its face and as applied to him. The district court rejected the motion based on Seventh Circuit precedent. Then, the Supreme Court decided *Bruen*.

This prompted Seiwert to file a second motion arguing that the analytical framework the Supreme Court announced in *Bruen* supported his view that § 922(g)(3) was unconstitutional. The district court rejected this motion as well, concluding that users of unlawful controlled substances fell outside the Second Amendment's protections and that firearm restrictions on unlawful users of controlled substances were "'relevantly similar' to other historical regulations."

Consequently, Seiwert's case proceeded to trial. The government presented testimony from multiple investigative agents, including testimony identifying the items recovered from the search and explaining how they were indicative of illicit narcotics use. The government also played for the jury Seiwert's recorded statements from the police station interview as well as video footage taken from German's residence on March 19, 2020, which depicted Seiwert pouring something from a digital scale into a glass pipe. After the government rested, Seiwert moved for a judgment of acquittal, which the district court denied.

For its part, the defense called Seiwert's sister, who testified that Seiwert had always refused to use needles of any kind. She also told the jury that their father had collected guns and surmised that some of the items recovered from Seiwert's house likely belonged to him. That said, she acknowledged that, although Seiwert had experienced periods of sobriety, his drug usage seemed to increase after their father's death.

The jury found Seiwert guilty on both counts. Seiwert filed a post-trial motion for judgment of acquittal and for a new trial, which the district court denied. Some time later, the court conducted a sentencing hearing and sentenced Seiwert to a term of imprisonment of twelve months and one day, as well as a term of supervised release of three years, on each count, to be served concurrently. Seiwert now appeals.

## II

Seiwert raises three arguments on appeal. First, he contends that § 992(g)(3)'s proscription on the possession of firearms by users and addicts of illegal drugs violates the Second Amendment. Second, he argues that the language of § 922(g)(3) is too vague in contravention of the Fifth Amendment's due process clause. Third, he challenges the jury verdict, asserting that the trial evidence was insufficient to prove his guilt beyond a reasonable doubt. We review each challenge *de novo*. *See United States v. Dalhouse*, 534 F.3d 803, 807 (7th Cir. 2008) (challenges to the sufficiency of evidence to support a verdict reviewed *de novo*); *United States v. Cote*, 504 F.3d 682, 685 (7th Cir. 2007) (questions concerning the constitutionality of federal statutes reviewed *de novo*).

**A**

Seiwert first argues that § 922(g)(3) violates the Second Amendment both on its face and as applied to him. Under § 922(g)(3), the possession of firearms is "unlawful for any person ... who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." 18 U.S.C. § 922(g)(3). The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

To prevail on a facial challenge, Seiwert must show that the statute is unconstitutional in all applications. *See City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015). As the Supreme Court noted in *United States v. Rahimi*, "[t]his is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Thus, "to prevail, the Government need only demonstrate that [the challenged provision] is constitutional in some of its applications." *Id.*

By contrast, to successfully advance an as-applied challenge, Seiwert need only demonstrate that the statute is unconstitutional in the manner as applied to him and the particular facts of his case. *See McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). To "avoid reaching unnecessary constitutional issues," we begin with Seiwert's as-applied challenge and proceed to his facial challenge only if necessary. *Doe v. Heck,* 327 F.3d 492, 527–28 (7th Cir. 2003).

As for the origin of § 922(g)(3), Congress first restricted unlawful drug users from possessing firearms when it passed the Gun Control Act of 1968. Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220–21 (1968). Although the statute initially targeted individuals who used or were addicted to "marihuana or any depressant or stimulant drug ... or narcotic drug," *id.*, Congress amended the Act in 1986 so that its proscription applied to "an unlawful user of or addicted to any controlled substance." Firearm Owners' Protection Act, Pub. L. No. 99-308, §§ 102(6)(B), (D), 100 Stat. 449, 452 (1986).

In general, the purpose of the Act was to "aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S. Rep. No. 1097 (1968), *reprinted in 1968 U.S.C.C.A.N. 2212, 2213*; *see also Huddleston v. United States*, 415 U.S. 814, 824 (1974). In other words, "Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 (1983) (internal quotation marks and citations omitted). As the Supreme Court put it, "Congress' intent in enacting §§ 922(g) and (h) ... was to keep firearms out of the hands of presumptively risky people." *Id.* at 113 n.6.

Then came *Bruen*, where the Supreme Court rejected the previously-used "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." 597 U.S. at 17. Instead, the Court concluded that the analytical framework should focus on the

amendment's "text and historical understanding." *Id.* at 19, 26. In the oft-cited passage, it held:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

The government points to our decision in *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), where we upheld the constitutionality of § 922(g)(3). But *Yancey* predated *Bruen* and applied the means-ends analysis that *Bruen* disavowed. *See id.* at 687.[1] Accordingly, we must take a fresh look employing *Bruen*'s text-and-history framework. *See Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) ("Nothing allows us to sidestep *Bruen* in the way the government invites…. We must

---

[1] To be sure, *Yancey* was based in part on analogizing habitual drug users to felons and the mentally ill, two groups whose categorical bans from the possession of firearms are "presumptively lawful." 621 F.3d at 683 (citing *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008)). But it did not apply the analytical framework established in *Bruen*.

undertake the text-and-history inquiry the Court so plainly announced and expanded upon at great length.").

First, *Bruen* directs us to determine whether the plain text of the Second Amendment protects individuals like Seiwert, who use or are addicted to unlawful controlled substances. 597 U.S. at 17. Put another way, are such persons among "the people" protected by the Second Amendment?

Citing to various passages from *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), the government contends that the Second Amendment protects only "law-abiding, responsible citizens." Because Seiwert does not fall within this category, it asserts, he is not part of "the people" as that term appears in the Second Amendment. But, in *Rahimi*, the Supreme Court eyed this argument with much skepticism, *see* 602 U.S. at 701 ("'Responsible' is a vague term. It is unclear what such a rule would entail."), and rebuffed the government's reading of *Bruen* and *Heller*, *see id.* at 702 (noting that "those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.'"). For present purposes, because it is not necessary for the disposition of this appeal, we will assume without deciding that the Seiwert is part of "'the people' whom the Second Amendment protects," and the guns identified in the indictment "are weapons 'in common use' today." *Bruen*, 597 U.S. at 31–32; *see Rahimi*, 602 U.S. at 701–02 (assuming without deciding that

the defendant was part of "the people" protected by the Second Amendment).[2]

With that, we turn to the historical portion of the *Bruen* analysis, where the government has the burden to show that the regulation in question is consistent with this nation's historical tradition of firearm regulation. 597 U.S. at 17. And because modern-day firearm restrictions rarely mirror exactly those from the Founding Era, the "historical inquiry that courts must conduct will often involve reasoning by analogy," which "requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28–29 (citations omitted).

This analogical method is "neither a regulatory straight-jacket [sic] nor a regulatory blank check." *Id.* at 30. While "courts should not uphold every modern law that remotely resembles a historical analogue," the government is only obligated to "identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (internal quotation marks omitted).

The Supreme Court identified two factors that courts should consider when conducting the relevantly-similar analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, "whether modern and historical regulations impose a

---

[2] Our discussion on this issue in *United States v. Gay*, 98 F.4th 843 (7th Cir. 2024), does not help the government, as it predates *Rahimi* and addressed it in the context of 18 U.S.C. § 922(g)(1).

comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald v. Chicago*, 561 U.S. 742, 767 (2010)).

This historical inquiry is "fairly straightforward" when the challenged regulation addresses a "general societal problem that has persisted since the 18th century." *Id.* at 26. In that situation, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* And "if earlier generations addressed the societal problem, but did so through materially different means," that too is evidence that the modern regulation is unconstitutional. *Id.* at 26–27. But where the challenged regulation implicates "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" may be required. *Id.* at 27.[3]

In *Rahimi*, the Supreme Court illustrated how courts might apply the *Bruen* framework in a particular case. There, the defendant brought an as-applied challenge to the constitutionality of § 922(g)(8), which forbids firearm possession for an individual subject to a domestic restraining order. 602 U.S. at 700. Perhaps unsurprisingly, the Court could not identify any laws from the Founding Era that contained an identical

---

[3] This language prompted Seiwert to argue that *Bruen* created two separate standards under the Second Amendment. Although the Court contemplated both a "fairly straightforward" and a "more nuanced" historical approach, we do not read *Bruen* as establishing two different tests. 597 U.S. at 26–27. Instead, we understand the passage to be providing examples of how a *Bruen* analysis might unfold depending on the nature of the concern underlying the modern-day regulation.

prohibition. But the Court surveyed the history of surety laws and "going armed" laws, concluding that they both supported the "common sense" notion that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. In this way, "when a challenged regulation does not precisely match its historical precursors," the Court held, "it still may be analogous enough" to be constitutionally sound. *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30).

As in *Rahimi*, the government is unable to identify a historical regulation that precisely matches § 922(g)(3). Although there is historical evidence that some Founding-era citizens were dependent on chemical substances like opium, *see United States v. Veasley*, 98 F.4th 906, 911–12 (8th Cir. 2024), the government has not pointed to any historical laws regulating firearm use of users of opium or similar substances. Instead, it asks us to consider the historical existence of laws that foreclosed firearm possession for (1) persons who are intoxicated, (2) those who suffer from severe mental illness, and (3) individuals who present a risk of public danger, asserting that these restrictions are relevantly similar to § 922(g)(3). We take each in turn.

**1**

Alcohol abuse has long been a general societal problem. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind* 8 (Boston, James Loring 8th ed. 1823) (describing "the history of drunkenness"); Karl Mann et al., *One Hundred Years of Alcoholism: The Twentieth Century*, 35 Alcohol & Alcoholism 10, 10 (2000) (discussing degenerationism and its utility in explaining "the social problems which were so visible at the end of the 19th century").

And those of the Founding Era were not immune. *See* David F. Musto, *The American Experience with Stimulants and Opiates*, 2 Persp. on Crime & Just. 51, 52 (1998) ("In the early Republic, an extremely high level of alcohol consumption (chiefly, distilled spirits) peaked in the 1830s at more than 7 gallons per adult."); *see also* Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 9–14 (1982).

Indeed, the Founders were well aware that intoxicated individuals posed a significant risk to the public. Rush, *supra*, at 6. Declaring public drunkenness "the roote and foundacion of many other enormious Synnes, as Bloodshed Stabbinge Murder … and such lyke," England banned it in 1606. 4 Jac. 1 c. 5 (1606). And justices of the peace could require repeat offenders of the "Offence of Drunkenness" to post sureties for their good behavior and could jail those who did not comply. Michael Dalton, *The Country Justice* 289 (London, 1746). This sentiment was common on this side of the Atlantic as well. Benjamin Rush, a physician who was a signer of the Declaration of Independence and a delegate to the Continental Congress, considered "crimes and infamy … [the] usual consequences of the intemperate use of ardent spirits." Rush, *supra*, at 13.

Recognizing the threat of drunkenness to public order, some colonial legislatures enabled constables to confine drunks who endangered others. *See, e.g.*, Act of May 1658, § 4, *reprinted in Charters and General Laws of the Colony and Province of Massachusetts Bay* 82, 82 (Boston, T. B. Wait & Co. 1814) (allowing constables to apprehend drunks and keep them "in close custody" until brought before a magistrate); *General Laws and Liberties of the Massachusetts Colony* 81 (Cambridge, 1672) (authorizing the imprisonment of drunks who "abuse[d]" others "by striking or reviling" them); Act of 1675,

*reprinted in Grants, Concessions, and Original Constitutions of the Province of New-Jersey* 107, 107 (Aaron Leaming & Jacob Spicer eds., Philadelphia, 1758) (providing that drunks who "are unruly and disturbers of the peace, shall be put into the stocks, until they are sober").

In the late Founding Era, some states decided that merely being intoxicated in public was enough to warrant incarceration. *See, e.g.*, Act of June 18, 1807, *reprinted in Laws of the State of New Hampshire, Passed from December Session, 1805, to June Session, 1810, Inclusive* 74, 74 (Concord, 1811) (providing for the apprehension of "common drunkards" and allowing police to jail them "until the following day" if the arrest occurred at night); *Compend of the Acts of Indiana, from the Year Eighteen Hundred and Seven Until that of Eighteen Hundred and Fourteen, Both Inclusive* 54–55, 91 (General W. Johnston ed., Vincennes, 1817) (enabling constables to jail drunkards for being noisy in public for up to forty-eight hours).

Some colonies and states in the Founding Era enacted surety regimes, making drunkards either give security for good behavior or be imprisoned and thus disarmed. *See, e.g.*, Act of 1662, *reprinted in Acts and Laws, of His Majesties Colony of Rhode-Island, and Providence-Plantations in America* 9, 11 (Boston, 1719); An Act Against Breaking the Peace, *reprinted in Acts and Laws of the State of Connecticut, in America* 188, 189 (Hartford, 1786); Act of 1623, *reprinted in Public Laws of the State of South-Carolina, from Its First Establishment as a British Province Down to the Year 1790, Inclusive* app. at 26 (Philadelphia, 1790); Act of Dec. 26, 1792, *reprinted in Digest of the Laws of Virginia* 756, 756 n.2 (Joseph Tate ed., 2d ed., Richmond, 1841) (citing Michael Dalton, *The Country Justice* 293 (1682)); Act of Dec. 16, 1812, *reprinted in Digest of the Laws of the Corporation of the City*

*of Washington, to the First of June, 1823*, 141, 141 (Samuel Burch ed., Washington, D.C., 1823) (providing that "persons found ... drunk in or about the streets" may be "required to enter into security for good behavior for a reasonable time" and "shall be confined to labor for a time not exceeding ninety days" in case of refusal or inability to give security); *see also* Act of 1739–1740, *reprinted in* 1 *Laws of the State of Delaware* 173, 173–74 (New Castle, Del., 1797) (levying a fine for drunkenness and further allowing a drunkard to be "bound to his or her good behavior" when sued for resisting arrest or using "abusive, reviling or threatening speeches against" the court); Act of 1723, *reprinted in Digest of the Laws of Maryland* 205, 205–06 (Thomas Herty ed., Baltimore, 1799) (penalizing drunkenness in the presence of various officials and providing that those who "revil[e]" officers "in the execution of this act, shall give security ... for his good behavior for three months, or suffer one month's imprisonment without bail").

It is not surprising, then, that at least one colonial legislature specifically regulated firearm use by individuals while they were drinking. In 1656, the Virginia legislature prohibited "shoot[ing] any gunns at drinkeing [events]." While the express intent of this law was to ensure the preservation of gunpowder, underlying it was the belief that a drunken person could not dependably operate a firearm. Act of Mar. 10, 1656, *reprinted in* 1 *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, 401, 401–02 (William Waller Hening ed., New York, 1823).

That same common-sense notion can be found in similar ordinances from the Founding Era. A 1731 Rhode Island law barred using firearms in taverns after dark. Act of 1731 &

1737, *reprinted in Acts and Laws of the English Colony of Rhode-Island and Providence-Plantations* 120, 120 (Newport, 1767). Likewise, in 1771, New York prohibited firing guns during the New Year's holiday to "prevent[] the 'great Damages … frequently done on [those days] by persons … being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Act of Feb. 16, 1771, *reprinted in* 5 *Colonial Laws of New York from the Year 1664 to the Revolution* 244, 244–46 (Albany, 1894)).

Militia laws from the 1700s, though limited in application, further reflect Founding-era concerns about permitting intoxicated individuals to carry firearms. For example, New Jersey, Pennsylvania, and South Carolina each had statutes disarming or authorizing the confinement of drunk soldiers. *See* Act of May 8, 1746, *reprinted in* 2 Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8 at 25–26 (1947) (New Jersey statute providing that "if any Soldier shall … appear in Arms disguised in Liquor, it shall and may be lawful for the Captain or Commanding Officer to disarm such Solder at the Head of his Company"); Act of Mar. 20, 1780, *reprinted in* Selective Serv. Sys., *supra*, pt. 11 at 97 (Pennsylvania statute providing that "if any non-commissioned officer or private shall … be found drunk … he shall be disarmed"); Act of Feb. 26, 1782, *reprinted in* Selective Serv. Sys., *supra*, pt. 13 at 96 (South Carolina statute providing that soldiers may be "cashiered" or "confined till sober" if "found drunk on guard"). And other legislatures prohibited the sale of alcohol to local soldiers. Act of May 22, 1756, *reprinted in* Selective Serv. Sys., *supra*, pt. 5 at 83, 93 (Maryland statute); Act of May 8, 1703, § 19, *reprinted in* Selective Serv. Sys., *supra*, pt. 13 at 8, 13 (South Carolina statute).

As we move to the mid- to late-nineteenth century and early twentieth century, at least three states continued the tradition of prohibiting drunken individual from carrying firearms. Act of Feb. 23, 1867, § 1, 1867 Kan. Sess. Laws 25, 25 (providing that "any person under the influence of intoxicating drink ... who shall be found within the limits of this State, carrying on his person a pistol ... or other deadly weapon, shall be subject to arrest upon charge of misdemeanor"); Act of Feb. 28, 1878, § 2, 1878 Miss. Laws 175, 175 (prohibiting the sale of firearms "to any … person intoxicated, knowing him to be … in a state of intoxication"); Mo. Rev. Stat. § 1274 (1879) (criminalizing the carrying of "any kind of firearms ... or other deadly weapon" "when intoxicated or under the influence of intoxicating drinks"); Act of Apr. 3, 1883, § 3, 1883 Wis. Sess. Laws 290, 290 (prohibiting "go[ing] armed with any pistol or revolver" "in a state of intoxication"); Act of Feb. 17, 1909, 1909 Idaho Sess. Laws 6, 6 (prohibiting the carrying of any "pistol, revolver, gun, or any other deadly or dangerous weapon ... when intoxicated, or under the influence of intoxicating drinks"). It is true that these restrictions were enacted more than a century after the Founding. But absent any indication that these regulations "contradict[] earlier evidence," they are pertinent to our inquiry. *Bruen*, 597 U.S. at 66; *see generally id.* at 60–70 (examining statutes enacted in the Civil War and Reconstruction Eras).

Returning to our case, Seiwert acknowledged that he had used crack cocaine mere hours before the firearms were recovered from his home. He also admitted that he had been using illicit drugs every day for twenty years and was expecting his drug dealer to arrive with even more cocaine before officers came to search his home. As with excessive alcohol consumption, heroin and cocaine use typically causes

immediate deficits in cognitive function. *See* National Institute on Drug Abuse, Research Report Series: Heroin, Revised November 2014 ("After the initial effects, users usually will be drowsy for several hours; mental function is clouded; heart function slows; and breathing is also severely slowed, sometimes enough to be life-threatening."); National Institute on Drug Abuse, Research Report Series: Cocaine, Revised May 2009 ("Users take cocaine in 'binges,' during which the cocaine is used repeatedly and at increasingly higher doses. This can lead to increased irritability, restlessness, and paranoia—even a full-blown paranoid psychosis, in which the individual loses touch with reality and experiences auditory hallucinations.").

Thus, as applied to Seiwert, § 922(g)(3) performs the same function as historical laws directed at intoxicated individuals and in the same way: it prohibits individuals whose cognitive abilities are presently hampered by chemical substances from possessing firearms in order to safeguard the public. In this way, § 922(g)(3) as applied to Seiwert is relevantly similar to historical laws prohibiting intoxicated individuals from having firearms and passes constitutional muster.[4]

---

[4] We are mindful of the Fifth Circuit's decision in *United States v. Connelly*, 117 F.4th 269, 292 (5th Cir. 2024). There, the defendant, who was accused of habitual or occasional drug use, was prosecuted under § 922(g)(3) for possessing a firearm. However, unlike here, there was no evidence that the defendant was intoxicated at the time of her arrest. *Id.* ("[The defendant] stated that she would at times partake as a sleep aid or to help with anxiety, but we do not know how much she used at those times or when she last used, and there is no evidence that she was intoxicated at the time she was arrested."). This is enough to distinguish *Connelly*.

**2**

The government also points to Founding-era laws confining (and, in the process, disarming) the mentally ill as another historical analogue to § 922(g)(3) as applied to Seiwert. Although drug use and mental illness are certainly dissimilar in many ways, there is a behavioral similarity between those who are "briefly mentally infirm as a result of intoxication" and those "permanently mentally infirm" because of illness or disability. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1535 (2009). Indeed, the Founders often analogized intoxication to mental illness, likening the effects of drunkenness to "a temporary fit of madness." Rush, *supra*, at 6. Thomas Cooley, a constitutional scholar of the nineteenth century, similarly observed that "[d]runkenness is regarded as temporary insanity." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the American Union* 599 n.1 (2d ed., Boston, Little, Brown & Co. 1871). And medical observers have come to regard excessive drinking as a "significant" trigger of "madness." Mary Ann Jimenez, *Changing Faces of Madness* 72 (1987).

It is true that Founding-era regulations specifically addressing the intersection of mental illness and firearms are hard to come by, *United States v. Connelly*, 117 F.4th 269, 275 (5th Cir. 2024), but the historical evidence illustrates a common practice of locking up individuals who suffered from such severe mental illness that they posed a present danger to others. For example, in England, the Vagrancy Act of 1744 permitted authorities to lock up and seize the property of those "who by lunacy ... are furiously mad, or are so far disordered

in their senses that they may be dangerous." 17 Geo. 2 c. 5–6 (1744); *see also* Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487, 509–10 (1985). Concerns about the mentally ill carried over to America where they "were generally treated as if they had been … [s]tripped of … their rights and privileges." Albert Deutsch, *Public Provision for the Mentally Ill in Colonial America*, 10 Soc. Serv. Rev. 606, 607–08 (1936). Some of the colonies authorized justices of the peace to "apprehend[], and ke[ep] safely locked up" those who were deemed "by lunacy so far disordered in his senses, that he is dangerous to be permitted to go abroad." Henry Care & William Nelson, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed., Providence, 1774).

Along similar lines, a number of states enacted statutes permitting the commitment of persons determined by justices of the peace, magistrates, or selectmen to be "[l]unatics" or of "unsound mind," including around the time of the Second Amendment's ratification. *See, e.g.*, Act of 1769, *reprinted in Collection of All Such Public Acts of the General Assembly, and Ordinances of the Conventions of Virginia, Passed Since the Year 1768, as Are Now in Force* 13, 13 (Richmond, 1785) (providing that "persons of insane and disordered minds" who are found "at large" may be "transmit[ted]" by the authorities to a "public hospital"); Act of 1787, *reprinted in* 2 *The Statute Law of Kentucky* 578, 578–79 (William Littell ed., Frankfort, 1810) (allowing the authorities to commit those with "unsound" minds to hospitals if no one is willing to take care of them); Act of Dec. 24, 1792, *reprinted in* 1 *Statutes at Large of Virginia, from October Session 1792, to December Session 1806, Inclusive* 162, 163 (Samuel Shepherd ed., Richmond, 1835) (same); Act of Feb. 27, 1798, § 3, *reprinted in* 2 *Laws of the Commonwealth of*

*Massachusetts from November 28, 1780 to February 28, 1807*, 812, 813 (Boston, 1807) (providing that "any person" who "is lunatick, and so furiously mad as to render it dangerous to the peace ... for such ... person to go at large[,]" may be committed "to the house of correction"); Act of Oct. 1793, § 18, *reprinted in Statute Laws of the State of Connecticut, Book 1*, 382, 386 (Hartford, 1808) (providing that "if any distracted or lunatic person shall go at large, who is dangerous and unfit to be without restraint, whereby any person may be endangered in person or estate, it shall be the duty of the civil authority ... to order, and direct that he be confined in some suitable place").

That said, a "lunatic" who posed no danger to society was allowed to remain free and retained his civil liberties. *See* Anthony Highmore, *A Treatise on the Law of Idiocy and Lunacy* 128–29 (London, 1807) (indicating that lunatics could create valid wills during lucid periods); *cf.* Gerald N. Grob, *The Mad Among Us* 7 (1994) (describing Massachusetts provision enacted in 1641 providing that "Idiots [and] Distracted persons ... shall have such allowances and dispensations in any Cause whether Criminall or other as religion and reason require"). But when a person's mental illness made him dangerous, he could, for example, be "confined in barred cells in the basement," and "particularly violent individuals" were "restrained … using a 'strait-waistcoat' or 'mad shirt,' or heavy arm and leg chains." Lynn Gamwell & Nancy Tomes, *Madness in America* 20 (1995); *see generally* Deutsch, *supra*, at 606 (providing an overview of societal attitudes toward, and communal provisions for, the mentally ill in colonial America).

Thus, confinement, which necessarily included disarmament, *see Veasley*, 98 F.4th at 913, was intended "to preserve the peace of the community." Alan Dershowitz, *The Origins of*

*Preventive Confinement in Anglo-American Law, Part II: The American Experience*, 43 U. Cin. L. Rev. 781, 787–88 (1974). And these restrictions typically lasted "only so long as such lunacy or disorder shall continue, and no longer," Care & Nelson, *supra*, at 329, consistent with the Founders' understanding of mental illness as a temporary affliction of one's mental faculties.[5]

In addition, in the nineteenth century, several states had outright prohibited the sale of firearms to the mentally ill. *See* Act of Feb. 4, 1881, § 1, 1881 Fla. Laws 87, 87 ("[I]t shall be unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife."); Act of Mar. 5, 1883, § 1, 1883 Kan. Sess. Laws 159, 159 ("Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, … or other dangerous weapons … to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor …."); Act of Feb. 17, 1899, § 52, 1899 N.C. Sess. Laws

---

[5] Indeed, William Blackstone, an influential authority on the laws of England at the time, defined a "lunatic" as "one who hath had understanding, but by disease, grief, or other accident, hath lost the use of his reason. A lunatic is indeed properly one that hath lucid intervals; sometimes enjoying his senses, and sometimes not, and that frequently depending upon the change of the moon." 1 William Blackstone, Commentaries *304. He further added that "the law always imagine[d], that these accidental misfortunes may be removed …." *Id.*; *see also* Highmore, *supra*, at 104–05 (explaining that "[a] lunatic is never to be looked upon as irrecoverable," describing what must be done "[i]n case [a] lunatic recovers his senses," and referring to lunacy as "periods of imbecility").

3, 20–21 ("It shall be unlawful for any person to sell or give to any inmate of a state hospital ... any deadly weapon, or any cartridge or ammunition for firearms of any kind ...."). These types of regulations became even more common in the twentieth century. Act of Mar. 30, 1927, § 7, 1927 N.J. Laws 742, 745 ("Any person who shall knowingly sell [any machine gun, automatic rifle, revolver, pistol, or other firearm] ... to a person not of sound mind ... shall be guilty of a misdemeanor."); Act of June 11, 1931, § 8, 1931 Pa. Laws 497, 499 ("No person shall deliver a firearm to any person ... of unsound mind."); Act of Feb. 21, 1935, § 6, 1935 Ind. Acts 159, 161 ("No person shall deliver a pistol to any person ... of unsound mind."); Act of Mar. 14, 1935, 1935 S.D. Sess. Laws ch. 208 § 8, 355, 356 ("No person shall deliver a pistol to any person ... of unsound mind."); Act of Mar. 23, 1935, § 8, 1935 Wash. Sess. Laws 599, 601 ("No person shall deliver a pistol to any person ... of unsound mind."); Act of Apr. 6, 1936, § 8, 1936 Ala. Acts 51, 52 ("No person shall deliver a pistol to any person ... of unsound mind.").

Again, here, Seiwert told officers that that he had used crack cocaine just a "[c]ouple [of] hours" before the police searched his home and that he was waiting for more. He also admitted to having used both heroin and crack cocaine every day for the past twenty years. Not only does scientific research indicate that drug use results in an immediate decline in mental faculties (as described above), but long-term chronic heroin and cocaine use is associated with severe ongoing psychological deficits. *See* National Institute on Drug Abuse, Research Report Series: Heroin, Revised November 2014 ("Studies have shown some deterioration of the brain's white matter due to heroin use, which may affect decision-making abilities, the ability to regulate behavior, and

responses to stressful situations."); Substance Abuse and Mental Health Services Administration, Treatment Improvement Protocol Series: Treatment for Stimulant Use Disorders, Updated 2021 (describing neuropsychological impairments from chronic use of cocaine and citing study finding strong association between the long-term use of cocaine and deficiencies in attention, response inhibition, working memory, cognitive flexibility, and psychomotor performance).

Thus, like the Third and Eighth Circuits, we conclude that the application of § 922(g)(3) to a drug user like Seiwert is justified by closely analogous public safety concerns underlying historical laws preventing individual with severe mental illness from possessing firearms. *See United States v. Harris*, 144 F.4th 154, 160–64 (3d Cir. 2025); *Veasley*, 98 F.4th at 915–16; *cf. Connelly*, 117 F.4th at 277 ("Perhaps the government could succeed if it were able to demonstrate that the drugs [the defendant] used were so powerful that they rendered her permanently impaired in a way comparable to severe mental illness. It also might succeed if it were able to demonstrate that [the defendant]'s drug use was so regular and heavy that it rendered her continually impaired."); *United States v. Daniels*, 124 F.4th 967, 976 (5th Cir. 2025) ("So, if the government could show that an individual's drug use was so frequent, severe, and impairing as to render him analogous to the dangerously mentally ill, disarming him under § 922(g)(3) might find support in the historical tradition of confining and disarming mental patients.") (footnote omitted).

For these reasons, the application of § 922(g)(3) to Seiwert, who was persistently and presently impaired during the periods alleged in the indictment, is relevantly similar to our

tradition of confining and disarming persons suffering from severe mental illness.

**3**

For the sake of completeness, we consider the last category of historical laws the government offers as an analogue to § 922(g)(3): laws disarming individuals who present a risk of danger. But, while laws targeting drunken persons and individuals with severe mental illness are specific in scope, this category is more general, and we "must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). When we take a closer look, we question whether § 922(g)(3)'s application to Seiwert may be defended based on historical laws targeting generally dangerous persons.

First, the government relies on historical laws that disarmed individuals whom the authorities thought would endanger the public for political reasons. Take, for example, the Militia Act of 1662, which enabled authorities to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom." 14 Car. 2 c. 3, § 13 (1662). As its history shows, the purpose of the Act was to provide a legal justification for Charles II and James II to disarm their political opponents. Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 Ga. L. Rev. 1, 8–9 (1996). Similarly, several colonies enacted laws disarming those who were thought to be threats to the revolutionary cause. For instance, in 1775, the legislature of Connecticut passed a law disarming any person convicted of "libel[ing] or defam[ing]" any acts or resolutions of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges of the same." Act of Dec. 1775, *reprinted in Public Records of the*

*Colony of Connecticut, from May, 1775, to June, 1776, Inclusive* 192, 193 (Charles J. Hoadly ed., Hartford, 1890).[6]

The government also cites laws that prohibited individuals whose religious beliefs were thought to pose a public threat. For instance, when Protestants William and Mary took the English throne, Parliament enacted the 1689 Bill of Rights, which qualified the Militia Act by guaranteeing "[t]hat the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M. sess. 2 c. 2 (1689), *reprinted in* 6 *The Statutes of the Realm* 142, 143 (1819). At the same time, Parliament prohibited Catholics from possessing arms unless they renounced their faith. *See* 1 W. & M. sess. 1 c. 15, *reprinted in* 6 *Statutes of the Realm* 71, 71–72 (captioning the law as "An Act for the better secureing the Government by disarming Papists and reputed Papists," prohibited a Catholic from "hav[ing] or keep[ing] in

---

[6] In fact, in 1776, the Continental Congress called for the colonial governments to disarm those who were "notoriously disaffected to the cause of America" or who "have not associated, and shall refuse to associate, to defend, by arms," the colonies. Resolution of Mar. 14, 1776, *reprinted in* 4 *Journals of the Continental Congress, 1774–1789*, 201, 205 (1906). And several colonies heeded this call. *See* Act of May 1, 1776, *reprinted in* 5 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479 (Boston, 1886); Act of June 1776, *reprinted in* 7 *Records of the Colony of Rhode Island and Providence Plantations* 566 (John Russell Bartlett ed., Providence, 1862); Act of 1777, *reprinted in* 1 *Public Acts of the General Assembly of North-Carolina* 228 (Francois-Xavier Martin ed., Newbern, Martin & Ogden 1804); Act of Sept. 20, 1777, ch. 40, 1776–1777 N.J. Laws 84, 90; Act of June 13, 1777, ch. 756, *reprinted in 9 Statutes at Large of Pennsylvania from 1682 to 1801*, 110, 112–13 (James T. Mitchell & Henry Flanders eds., 1903); Act of May 1777, ch. 3, *reprinted in 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, 281, 282 (William Waller Hening ed., Richmond, 1821).

his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace … for the defense of his House or person)."). *Id.*

The government is correct that both sets of laws are concerned about keeping firearms away from groups that might pose a threat to the public. But we see little resemblance between those who would consciously disobey the law for religious or political reasons and those, like Seiwert, who endanger the public by suffering from a condition that impairs their ability to obey it. Thus, the historical laws governing religious and political dissidents appear to address concerns different from those underlying § 922(g)(3).

Next, the government points to historical laws that disarmed groups who wielded arms to threaten the public. For instance, the government cites the 1328 Statute of Northampton, which codified the common-law prohibition on "go[ing] armed to terrify the King's subjects." Sir John Knight's Case (1686) 87 Eng. Rep. 75, 76; 3 Mod. 117, 118 (citing Statute of Northampton 1328, 2 Edw. 3 c. 3); *see also Bruen*, 597 U.S. at 40–45 (discussing the statute in greater detail). Some colonies also prohibited carrying weapons in a way that produced fear or terror. *See, e.g.*, Act of Nov. 1, 1692, ch. 18, § 6, *reprinted in* 1 *Acts and Resolves of the Province of the Massachusetts Bay* 51, 52–53 (Boston, 1869) (providing for the arrest of those who "ride, or go armed offensively before any of their majesties' justices or other their officers or ministers doing their office or elsewhere by night or by day, in fear or affray of their majesties' liege people"); Act of June 14, 1701, ch. 7, *reprinted in* 1 *Laws of New Hampshire* 677, 679 (Albert Stillman Batchellor ed., John B. Clarke Co. 1904) (providing for the arrest of "all Affrayers,

Rioters, Disturbers, or Breakers of the peace or any other that shall goe Armed Offensively to putt his Maj'ties Subjects, in ffear by threatning Speeches").

The application of these going-armed laws depended on "judicial determinations of whether a particular defendant … had threatened another with a weapon." *Rahimi*, 602 U.S. at 699. And punishment for violations could include "forfeiture of the arms[] and imprisonment." *Id.* at 697 (quoting 4 William Blackstone, Commentaries *149). The authorities could even require people to post surety bonds before going armed to "prevent[] violence before it occurred," but only after providing "significant procedural protections." *Id.* at 696–97 (citing Mass. Rev. Stat. ch. 134, §§ 1, 3–4, 16 (1836)).

While the surety and going-armed laws may justify applying § 922(g)(3) to drug users engaging in terrifying conduct, they too seem a mismatch to the facts here. Seiwert has no prior criminal history, and the government has not demonstrated that he had any intention to terrorize the public in any way. Nor has the government presented any particularized evidence demonstrating that Seiwert's drug use predisposed him to violence or aggression during the relevant time periods. Perhaps the government may be able to make such a showing in another case, but the present record falls short.

Finally, the government points to discussions during the ratification of the Constitution about the need to disarm dangerous citizens. For instance, earlier versions of the Second Amendment proposed at state ratifying conventions permitted the disarmament of individuals for "real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing a proposal at the Pennsylvania convention). At the Pennsylvania ratifying convention, a

suggested amendment would have protected the right to bear arms "unless for crimes committed, or real danger of public injury from individuals." The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents (1787), *reprinted in* 2 *Documentary History of the Ratification, supra*, at 618, 624. At the Massachusetts convention, Samuel Adams proposed an amendment that included the condition that "*peaceable citizens*" shall not be prevented by the Constitution "from keeping their own arms." *Id*. at 675, 681 (emphasis added); *see also* Convention Journal (Feb. 6, 1788), *reprinted in* 6 *The Documentary History of the Ratification of the Constitution* 1452, 1453 (J. Kaminski et al. eds., 2000). And a proposed amendment from the New Hampshire convention provided that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." Schwartz, *supra*, at 758, 761.

While this is certainly pertinent history, the language of the Second Amendment that was ultimately ratified provides an unqualified right that "shall not be infringed." U.S. Const. amend. II. We are wary of relying upon verbiage in predecessors of the Second Amendment that did not gain ratification.

In sum, we conclude that historical laws that kept guns out of the hands of the intoxicated and the mentally ill are sufficiently analogous to § 922(g)(3)'s proscription of firearm possession by active and persistent drug users like Seiwert to satisfy constitutional scrutiny. Furthermore, because § 922(g)(3) is constitutional as applied to Seiwert, his facial challenge also fails because he cannot demonstrate that the statute would be unconstitutional in all applications. *See Rahimi*, 602 U.S. at 693; *Salerno*, 481 U.S. at 745. Accordingly, § 922(g)(3) survives

Seiwert's as-applied and facial challenges under the Second
Amendment.

**B**

Seiwert next argues that § 922(g)(3) is unconstitutionally
vague on its face and as applied to him in violation of the Fifth
Amendment. But, as Seiwert himself acknowledges, we disal-
lowed facial challenges to 18 U.S.C. § 922(g)(3) in *United States
v. Cook*, invoking "the general rule that a defendant whose
conduct is clearly prohibited by a statute cannot be the one to
make a facial vagueness challenge." 970 F.3d 866, 877 (7th Cir.
2020) (citation omitted). Seiwert contends that our reasoning
in *Cook* directly conflicts with the Supreme Court's precedent
in *Johnson v. United States*, where the Court "squarely" re-
jected "the theory that a vague provision is constitutional
merely because there is some conduct that clearly falls within
the provision's grasp." 576 U.S. 591, 602 (2015). His conten-
tion, however, rests on grounds that we already rejected in
*Cook*. Accordingly, Seiwert cannot bring his facial-vagueness
attack on § 922(g)(3) without first showing that the statute is
vague as applied to him.

Seiwert cannot make this showing. Seiwert contends that
the definition of "unlawful user of a controlled substance" in
the pertinent jury instruction in this case raises a whole host
of hypothetical questions. But, for an as-applied challenge, a
court must examine the facts before it, "not any set of hypo-
thetical facts under which the statute might be unconstitu-
tional." *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir.
2011). In *Cook*, we recognized that an as-applied vagueness
challenge to § 922(g)(2) "would surely fail" for a defendant
who admitted to "using marijuana for almost ten years," in-
cluding smoking "two blunts on the day of his arrest." 970

F.3d at 877–78. Seiwert's as-applied challenge fares no better.[7] At trial, the jury heard his taped interview, during which Seiwert told officers about his daily use of heroin and crack cocaine for twenty years, including on that very day. Having engaged in clearly proscribed conduct, Seiwert cannot complain of the vagueness of the law as applied to the conduct of others. We therefore reject his vagueness challenges to § 922(g)(3).

## C

Finally, Seiwert questions the sufficiency of the evidence supporting his convictions. In this type of challenge, "we review the evidence presented at trial in the light most favorable to the government and draw all reasonable inferences in its favor." *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021). "We will overturn a conviction only if, after reviewing the record in this light, we determine that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id.*

The district court instructed the jury that, to find Seiwert guilty of violating § 922(g)(3), it must conclude beyond a reasonable doubt that (1) he knowingly possessed a firearm; (2) at the time of the possession, he was an unlawful user of, or addicted to, a controlled substance; (3) at the time of the

---

[7] Seiwert does not distinguish *Cook*. Instead, he relies heavily on an out-of-circuit district court decision in *United States v. Morales-Lopez*, No. 20-cr-00027 (JNP), 2022 WL 2355920 (D. Utah June 30, 2022), which concluded that § 922(g)(3) is void for vagueness as to the term "unlawful user." However, the Tenth Circuit reversed that decision, rejecting all of the arguments that Seiwert advances. *See United States v. Morales-Lopez*, 92 F.4th 936, 941–46 (10th Cir. 2024).

possession, he knew he was an unlawful user of, or addicted to, a controlled substance; and (4) the firearm had been shipped or transported in interstate commerce before he possessed it.[8] The court defined the term "unlawful user of a controlled substance" as "the regular and repeated use of a controlled substance in a manner other than as prescribed by a licensed physician." And it required the government to "establish that [Seiwert] was engaged in a pattern of regular and repeated use of a controlled substance during a period that reasonably covers the time a firearm was possessed."

Seiwert first contends that no rational jury could have found that he was an unlawful user. Although he had a history of using controlled substances, Seiwert says, he did have periods when he was not partaking in drugs at all. Seiwert also points to evidence that he did not use needles, that the triple beam scale could also be used for making ammunition, and that the rest of the drug paraphernalia introduced at trial had not been forensically examined.

But the jury also heard Seiwert make a number of incriminating statements about his own drug use. He admitted that he had used crack cocaine on the same day that the Ruger revolver was found in his possession. He told the agents that he was a "drug addict" and that he had used heroin and crack cocaine every day for twenty years. He estimated having bought narcotics from German about 300 times in the months prior. And he told agents that he had cash that he had planned to spend on buying even more crack cocaine that day.

---

[8] Apart from the constitutionality and vagueness challenges to the underlying law, Seiwert raises no other objections to the jury instructions.

Additionally, Seiwert's account of his drug use was corroborated by other trial evidence. Agents observed Seiwert frequently coming and going from German's house. Video evidence captured Seiwert appearing to pour narcotics into a glass pipe. In text messages, Seiwert asked German for a half gram each of crack cocaine and heroin. Seiwert gave the Beretta to German in the hope of receiving narcotics in return. And his sister testified that their father's recent death triggered an increase in Seiwert's drug use. Considering the evidence in the light most favorable to the government, a reasonable jury could very well conclude that Seiwert was engaged in the "regular and repeated use" of controlled substances during the periods alleged in the indictment.

Seiwert also maintains that he did not know that he qualified as an unlawful user. He stresses that agents did not arrest him for possession of controlled substances but for illegal firearm possession. But the government need only prove that Seiwert was aware he was an unlawful user of a controlled substance; it did not have to show that Seiwert knew his extensive drug use prohibited him from possessing a firearm. *See United States v. Maez*, 960 F.3d 949, 954–55 (7th Cir. 2020) (rejecting argument that defendants must know that it was a crime to possess a firearm as a result of their prohibited status); *see also United States v. Triggs*, 963 F.3d 710, 714–15 (7th Cir. 2020). Here, Seiwert concedes that heroin and cocaine are unlawful substances under federal law and that he used the drugs daily for many years. Thus, Seiwert's sufficiency-of-the-evidence challenge lacks merit.

## III

For the foregoing reasons, we AFFIRM the judgment of the district court.